IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 12, 2008

## STATE OF TENNESSEE v. LAMARIO HILL

**Appeal from the Criminal Court for Shelby County**
**No. 05-08627    James C. Beasley, Jr., Judge**

**No. W2007-01741-CCA-R3-CD  - Filed June 4, 2009**

A Shelby County jury convicted the defendant, Lamario Hill, of first degree felony murder, attempted especially aggravated robbery, and aggravated assault. The trial court imposed concurrent sentences of life in prison for the defendant's murder conviction, nine years for his attempted especially aggravated robbery conviction, and four years for his aggravated assault conviction. On appeal, the defendant argues that the evidence produced at trial was insufficient to support his convictions. After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Robert Wilson Jones, District Public Defender; Garland Ergüden, Assistant District Public Defender (on appeal); and Mozella Ross, Memphis Tennessee (at trial), for the appellant, Lamario Hill.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Wax and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At trial, Abdo Ahmed testified through an interpreter that on the evening of August 23, 2005, he and his brother, Ali Alothmani, were working at Linc Minimarket, a convenience store located on Southern Avenue in Memphis. Ahmed said that about thirty minutes before the store closed, he attempted to exit the store through the front door when he was confronted by two black men whose faces were covered by "white cloth[s] that covered everything except the[ir] eyes." Ahmed said that he was not sure of the two men's identities. One of the men pulled a gun on Ahmed, pointed it at his face, and told him to "get back into the store or we will kill you." Ahmed said that he put his hands up, turned around, and reentered the store while telling the men that he would give them the

store's money. However, once the men got approximately five feet inside the store, the assailant with the gun fired two shots, one of which lodged in the ceiling and one of which hit Alothmani, who had been in the back of the store but who came toward the front when Ahmed confronted the two men. After the two men left the store, Ahmed opened the door and saw the two men running down the street. He said that no customers were in the store at the time of the shooting, although he saw one person outside the store.

Antonio Lampkins, who testified that he knew the defendant because the defendant's uncle was married to his (Lampkins') cousin, said that on the afternoon of August 23, 2005, he was playing basketball with the defendant, Nicholas Fletcher[1], and two other men whose names Lampkins did not remember. Lampkins said that at some point, the defendant said that he "wanted to rob a store" and asked Lampkins if he wanted "to hit the store with him." Lampkins replied that he did not. Later that evening, Lampkins, the defendant, Fletcher, and a fourth man with whom Lampkins was not familiar walked toward Southern Avenue. After a while, Lampkins turned around and went home. Lampkins said that as he walked toward the store, he did not see anyone with a gun, that the others did not have cloths covering their faces, and that he did not believe that the others would actually rob the store.

On cross-examination, Lampkins denied that his cousin Mookie, whom he identified on redirect as Calvin Lyons, was present with the others that night or had a role in planning the robbery. Lampkins said that as he and the others walked toward the store, they did not discuss robbing the store. He acknowledged that he did not find out that anything had happened at the store until Fletcher called him some time later and told him that "something had happened at that store."

Larry Jones testified that he visited the store at "nine or nine thirty" the evening of August 23, 2005. When he left the store, no customers remained there. After leaving the store, Jones walked down Southern Avenue toward Boston Street when three men ran past him. Jones said that one of the men carried a handgun at his side. He also said that he only saw the men from the back, so he did not see their faces, but he did see "maybe a scarf or bandana or something around the[ir] neck[s] . . . ." Jones surmised that the three men were "young . . . maybe in their teens or somewhere." Jones then saw Ahmed exit the store; according to Jones, Ahmed was "hollering and yelling and that's when I realized something had happened." Jones then saw the men turn onto Boston Street, heading north. On cross-examination, Jones said that he was unsure how many of the men wore bandanas or scarves around their necks when he saw them. He added that he did not recognize the men and that the men said nothing to him.

Officer Marcus Berryman, a crime scene investigator with the Memphis Police Department, testified that he examined the crime scene the night of the shooting. When Officer Berryman arrived inside the store, he found the victim lying dead in an aisle to the right of a rack containing various snacks. On the top shelf of the rack next to the victim, the officer found a box of Lemonhead candy with a bullet hole in it. Officer Berryman also found a bullet fragment embedded in the victim's left palm, just above his wrist. On cross-examination, Officer Berryman acknowledged that he did

---

[1]Fletcher was indicted as a co-defendant in this case; his case was severed from Hill's before trial.

not find a gun or any bullets at the crime scene. He also acknowledged that no weapons were tested in connection with this case.

Sergeant William D. Merritt with the Memphis Police Department testified that he and Sergeant T.J. Helldorfer, who did not testify at trial, investigated this case as part of their duties with the homicide squad. The two detectives first interviewed the defendant on August 25, 2005, at the police station. Sergeant Merritt said that the defendant's mother was present throughout the interview and signed the waiver of rights form along with the defendant. The detectives orally advised the defendant of his rights and "presented the advice of rights form that has the Miranda warnings printed on them to [the defendant] and to his mother and we had [the defendant] read the form to verify that he could read" the form. Sergeant Merritt testified that the defendant "seem[ed] to understand" his rights, had no questions about his rights, and was able to read the waiver form aloud to the detectives.

According to Sergeant Merritt, the defendant "initially told us that he was not involved in this incident. He told us that he was [in] the parking lot and [saw] several people run from the business." After this response, the detectives told the defendant that they "had interviewed others and that we were in the process of interviewing other people that we felt like were going to be involved in this incident and that we were going to compare what they told us to what he told us . . . to hopefully get to the truth . . . ." This comment prompted the defendant to offer a different version of events to the detectives. According to Sergeant Merritt, the detectives did not threaten the defendant into changing his statement. When asked to "[d]escribe the events that took place, before, during, and after the shooting at 2638 Southern," the defendant replied:

> Antonio Lampkins, Nick Fletcher, and Treyvaughn, I don't know his last name, met . . . at my house. We was talking about it. Well, Treyvaughn, he brought up about robbing the store, so we met up at the store, putting on our masks and Treyvaughn ran in with a gun, but me and Nick didn't get a chance to run in. We was at the door and Treyvaughn and the store clerk started shooting. Me and Nick ran down Boston. I was looking back to see Treyvaughn [come] out. He came out and we left.

The defendant said that he wore a white t-shirt over his face at the time of the incident. He also noted that Treyvaughn used a .357 Smith & Wesson handgun which he got from the defendant's brother, Marqual Hill, and that two shots were fired during the incident. The defendant claimed that his brother had kept the gun under his bed and that his brother had gotten rid of the gun the day he (the defendant) gave this statement to police.

The detectives later learned from the defendant's juvenile court probation officer that the defendant wished to speak with the police again. Thus, on September 1, 2005, the detectives met with the defendant and his court appointed special advocate, Tanji Skinner, at juvenile court. The detectives advised the defendant of his rights; he waived those rights and gave the police a statement. In this statement, he said that he shot the victim and that the third person with him and Fletcher at the convenience store was not Treyvaughn but a man named Kentori. According to the defendant, Kentori, who was present when the plan was devised to rob the store, stood outside the store while he went inside. The defendant said that the shooting "was an accident." When asked why he had

incorrectly identified the third person in his first statement to police, the defendant replied, "Supposed to tell you what I told you before. . . . I heard that his brother had did something, and I . . . didn't want to hurt my momma." Sergeant Merritt said that the police contacted Treyvaughn and learned that he was not in Memphis the night of the shooting.

On cross-examination, Sergeant Merritt acknowledged that the night of the shooting, he spoke with a man named Cordarius Torrey, who was also interviewed by other officers at the police station later that night. He also acknowledged that the defendant mentioned a person named "Kentori" during the first interview, but because Sergeant Helldorfer investigated this part of the case, he was unsure whether Kentori was Cordarius Torrey or some other person. Sergeant Merritt said that the identity of the fourth person who was present with the defendant, Lampkins, and Fletcher the afternoon before the shooting was never confirmed.

Sergeant Merritt said that Sergeant Helldorfer wrote "eighth grade, read aloud with difficulty, slow" on the defendant's first waiver of rights form. He said that the defendant and his mother "indicated to [the detectives] that they understood his rights and that they were willing to answer our questions that evening. If they had told us no, we're not going to answer questions or we want to speak with an attorney," the detectives would not have conducted the interview. He also noted that his mother "could have stopped the interview at any time, [but] that did not occur." Sergeant Merritt denied telling the defendant that his initial version of events was "not right" and he denied showing the defendant Fletcher's earlier statement to police. He also said that he and his partner "never told [the defendant] that he needed to tell the truth. We just told him that he needed to tell what role he played in this incident when he was up there." The detectives also told the defendant that they were "interviewing several people that were up and that we were going to be interviewing other suspects in this case." He acknowledged that the officers began speaking to the defendant at 9:50 p.m. and that the interview did not end until 12:25 a.m., but he denied that the statement took nearly two and a half hours because the detectives "had to bully [the defendant] into making this statement."

Sergeant Merritt testified that through their investigation, the police learned that Treyvaughn was an actual person who lived in Michigan, and while Treyvaughn had "connections" to the neighborhood, he was not present at the store the night of the shooting. He said that Treyvaughn's name was mentioned, along with the defendant's, during one of the eight versions of events provided by Fletcher during his statement. Sergeant Merritt acknowledged that after the defendant mentioned a gun in his first statement, the defendant's mother gave the police consent to search her house for the gun but no gun was found there. He also acknowledged that no gun was ever found in connection with the case.

Sergeant Merritt acknowledged that the defendant's mother was not present for his second statement to police. He said that the normal police procedure would have been for the police to attempt to contact the defendant's mother, but he was unsure whether Ms. Hill was actually contacted before the defendant's second statement. Sergeant Merritt also acknowledged that the court-appointed advocate who was present for the second statement was not an attorney, although he added that neither the defendant nor the advocate asked for an attorney during the interview. Sergeant Merritt said that he presumed that the advocate was present because the defendant's mother was not available at the time of the interview. He also acknowledged that he was unaware that the

-4-

defendant was mildly mentally retarded, although he added, "We don't request tests to see if someone is competent to understand their rights. That's out of our realm."

Dr. Marko Ross, a forensic pathologist, testified that he reviewed the results of the autopsy performed by Dr. Karen Chancellor, the chief Shelby County medical examiner at the time of this trial. Dr. Ross said that the victim died from a single gunshot wound to the chest. He said that "the path this bullet went was generally from the front of the [victim] towards his back and also from his left side towards his right side and in a downward direction." Dr. Ross described the bullet, which lacerated the victim's heart and was recovered from the victim's abdominal cavity, as a "medium caliber" projectile. He was unable to determine how far away the victim was from the gun at the time he was fired, other than to determine that given the lack of soot on the clothing, the wound was not a contact wound.

Betty Hill, the defendant's mother, was the first witness to testify on his behalf. She said that the day the defendant was arrested, "[a]bout three" officers knocked on her door and asked to see her son. She told the officers to wait while she went to the defendant's bedroom. After waking the defendant and telling him that the police wanted to see him, she returned to the front room of her house and found that "[a]bout five or six" officers, all of whom had their guns drawn, had made their way inside the house. She asked the police why they wanted the defendant and why they were treating him "like . . . a criminal" but the officers did not answer her. The police arrested the defendant, handcuffing him, and told his mother that she would have to come downtown as well. The officers then took the defendant and his mother to the police station in separate squad cars.

Ms. Hill said that some time after arriving at the police station, she and her son were led to an interrogation room, where two detectives asked him questions about the shooting. The defendant initially told the detectives that he was not inside the convenience store when the shooting occurred, but rather he was outside the liquor store next door to the convenience store. Ms. Hill said that he repeatedly told the detectives this version of events, to which the detectives repeatedly replied that the defendant was involved in the incident. At one point, one of the detectives told the defendant, "I'm tired and I'm ready to go home so tell your mama you were involved. . . . [Y]ou're going to juvenile court anyway when you leave here." This prompted Ms. Hill to ask the detectives whether the defendant had already been charged with anything; she claimed that they did not answer this question. She said that the detectives told her and the defendant that Fletcher had already told the police that the defendant was involved and that the detectives showed them Fletcher's statement.

According to Ms. Hill, before the questioning began the police showed her and her son a form which the police said "was for an attorney," adding that the detectives "didn't say it was for one . . . that same night." Noticing that the word "waiver" appeared on the form, she asked, "ain't this like waiving or giving my rights away?" The detectives replied, "no," so she and the defendant signed the form. Ms. Hill said that she did not ask to speak with an attorney that night and that she did not fully understand what was going on at the time, but she signed the form anyway.

Ms. Hill said that the day of the shooting, she had seen her son, Fletcher, Lampkins (whom she called Tonio), and two other persons whom she did not recognize playing basketball near her house. She was unaware of whether she saw Mookie outside her house that day. She said that as

she left her house for work, these people were standing in her front yard when Tonio asked her for a ride home. She declined, saying that she was late for work. On her way to work, she stopped at one store on Boston Street before driving past the Linc Minimarket, which was surrounded by police officers and crime scene tape. She claimed that someone standing outside the store told her that the store had been robbed and the owner shot.

Ms. Hill said that she was present when the police asked about the gun used in the shooting. She testified that while the defendant said that the gun belonged to Marqual, he did not say that he "got" the gun from Marqual, who lived with her and the defendant. She claimed that she told the police that Marqual did not keep a gun in her house. She also claimed that she signed a search warrant authorizing the police to search her home for weapons and that the police found no weapons during the search.

Ms. Hill said that during the 2004-05 school year, the one prior to her son's arrest, he was seventeen years old and was a freshman at East High School, where he made "all F's." She said that the defendant spent two years in the eighth grade, where he had made "D's and F's," before he received a social promotion to the ninth grade. She acknowledged that the defendant had "problems in school" throughout his academic career.

On cross-examination, Ms. Hill acknowledged that her son had received some B's and C's on his eighth grade report card during the 2003-04 academic year. She said that her house was about three minutes from the scene of the shooting and that she left her house around 9:45 the night of the shooting. Ms. Hill admitted that she did not read the waiver of rights form in great detail, but she claimed that her failing to review the form resulted from the detectives telling her that she was not giving up her rights and that the form was for a lawyer. She also claimed that the typewritten version of the detectives' questions and the defendant's answers to the questions did not accurately reflect the order in which the detectives asked the questions. However, she admitted that she did not read the typewritten interview when she initialed each page on the document.

Ms. Hill insisted that the defendant did not tell the detectives that Marqual Hill had gotten rid of the gun. She also insisted that she had never known Marqual to possess a gun before the incident. She acknowledged that Marqual had been arrested in March 2001 for unlawful possession of a weapon but that the charge resulted from the police finding a gun on the ground in the midst of four boys, including Marqual, all of whom were charged with weapons possession. She said that she was unaware that the gun was found on Marqual's person and that Marqual had told police that he had the gun for protection.

Rebecca Rutledge, Ph.D., a clinical psychologist, testified that she conducted a psychological evaluation of the defendant. She asked the defendant about the day of the incident; the defendant's answers to the questions were "very vague . . . . He said that he waited outside of a liquor store while his friend went in to buy cigarettes. He said that he heard shots and his friend ran out telling him that they needed to leave. They both ran. And he would not elaborate any further." She said that "[f]rom the way he described what happened that day . . . I would tell you that he probably didn't have a lot of foresight, was likely to be much more impulsive, in other words acting before thinking it through."

Dr. Rutledge said that she administered the Weschler Adult Intelligence Scales, which measured the defendant's intelligence quotient (IQ). She said that the defendant's full scale IQ of 69 was "in the range of mild mental retardation." When asked if she "observe[d] anything about his abilities," Dr. Rutledge noted that the defendant provided "very concrete . . . very short" answers to her questions. "A lot of times he did not understand what I was asking him. If I repeated [a question] several times, he still didn't quite get it. His response time to a question was slow . . . he was struggling."

Dr. Rutledge also administered the Wide Range Achievement test, which measured the defendant's reading and math ability. She said that the test showed the defendant to be reading at a third-grade level, which rendered him "functionally illiterate." Dr. Rutledge said that the defendant would be able to read the word "milk" on a milk carton but would be unable to comprehend the instructions on a medicine bottle. She opined that persons such as the defendant would never be able to read beyond a sixth-grade level. She said that the defendant would not have been able to read and understand the rights waiver form presented him by police, and while the defendant may have told the police that he understood his rights, he in fact did not understand them. The test also indicated that the defendant's math skills were on a fourth-grade level. After conducting additional tests designed to determine whether the defendant was malingering or "faking" his symptoms, she determined that the defendant was not malingering.

Regarding the defendant's understanding of the proceedings against him, Dr. Rutledge said that the defendant was able to answer simple questions such as "[w]hat does an attorney do," "[w]hat does the prosecutor do," and "[w]hat does the jury do." She also said that the defendant knew that he was "in big trouble." However, she said that the defendant "doesn't quite understand all the legalities about it. He doesn't understand how his case is going to be presented . . . his level of appreciation [is] . . . just not very well developed." She also testified that she "found him to be very acquiescent" in dealing with authority figures and that the defendant was not likely to be a "leader." In sum, Dr. Rutledge said that in her professional opinion, the defendant "had a limited understanding of the proceedings against him and a limited capacity to assist in his own offense." However, she also noted that the defendant "had the capacity . . . for knowing and purposeful conduct, and . . . he had the ability to appreciate right from wrong."

On cross-examination, Dr. Rutledge acknowledged that the defendant had been determined competent to stand trial. She also admitted that she had not read the statement the defendant gave to police and that she did not know the circumstances or the location of the offenses with which the defendant was charged. She also acknowledged that she did not review his school records or talk with his family members. Dr. Rutledge said that while the defendant had taken another test which determined his IQ to be 85, the particular test used to produce that result "always result[s] in kind of over[-]inflated IQ scores," and therefore was not a test which Dr. Rutledge used in her practice.

Marqual Hill, the defendant's older brother, testified that he saw the defendant, Lampkins, Fletcher, and a fourth person called Bookie, whom he claimed to be Lampkins' cousin, together the afternoon of the shooting. He denied owning a gun, hiding one at his mother's house, or providing one to the defendant. On cross-examination, he said that he saw the group leave his house but he did not know what time they left the house. He said that he saw a report of the shooting on the 9:00

news that evening and that the defendant was at home when the report aired. He also denied carrying a gun in the past. He said that while he was arrested for weapons possession in 2001, he denied telling the police after his arrest that he carried the gun for protection. He also noted that he did not talk to the police concerning this case; he said he did not talk to the police because they did not question him in connection with this incident.

Ronald Lax, a private investigator, testified that he learned that "Bookie's" real name was Kevin Lyons and that Lyons was Lampkins' cousin. According to Lax, Lyons lived in Detroit but was in Memphis the night of the shooting. Lax spoke with Lampkins' family; he said that the family members with whom he spoke became "very nervous" when asked about Bookie and claimed not to know Bookie's real name. On cross-examination, Lax acknowledged that family members are often nervous about giving information about a family member to a private investigator.

After its deliberations, the jury convicted the defendant of one count each of first degree felony murder, attempted especially aggravated robbery, and aggravated assault, as charged in the indictment. The defendant subsequently filed a timely notice of appeal.

## ANALYSIS

The defendant's sole issue on appeal is that the evidence produced at trial was insufficient to sustain his convictions. In his brief, the defendant states that while he "cannot argue . . . that absolutely no evidence exists to support his convictions in light of his statements of admission, he submits that the record does not reasonably support convictions greater than facilitation of" the three offenses with which he was convicted. The defendant's argument is rooted in his assertions that neither Ahmed, the surviving victim, or Jones, the customer who saw three men run past him after leaving the store, positively identified the defendant as the shooter, and that the defendant's mental capacity was such that he was pressured into taking responsibility for offenses which he did not commit. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

A conviction for first degree felony murder, as charged in the indictment, requires proof of a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2005). "No culpable mental state is required for conviction under [the felony murder statute] except the intent to commit the enumerated offenses or acts in such subdivisions." Id. § 39-13-202(b). Regarding the defendant's conviction for aggravated assault against victim Ahmed, our criminal code states that "[a] person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Id. § 39-13-101(a)(2). "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon[.]" Id. § 39-13-102(a)(1)(B).

The defendant was also convicted of attempted especially aggravated robbery of victim Alothmani. Our criminal code defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Especially aggravated robbery is defined as robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Id. § 39-13-403(a)(1)-(2). Tennessee's attempt statute states:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Id. § 39-12-101 (a)-(b).

Regarding the defendant's assertion concerning his mental state, we note that the defendant filed a motion to suppress his statements to police, which the trial court denied. The trial court also held a pretrial competency hearing, at the conclusion of which the trial court ruled that the defendant was competent to stand trial. On appeal, the defendant does not argue that the trial court's rulings were incorrect. Rather, the defendant appears to argue that in light of Dr. Rutledge's testimony regarding the defendant's mental difficulties, the defendant did not possess the necessary mental state to commit these offenses. However, after reviewing both Dr. Rutledge's testimony and the

testimony of Sgt. Merritt and Ms. Hill, who testified concerning the circumstances of the defendant's statements to police, the jury was not persuaded that the defendant's will was overridden or that he was incapable of acting intentionally or knowingly. The jury instead accredited the testimony of Antonio Lampkins, who testified that the defendant was the person who devised the idea of robbing a store, and the defendant's statement to police in which he admitted killing victim Alothmani.

Regarding the defendant's assertion that there was little proof to positively identify the defendant as the shooter, we note that "the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In this case, the defendant admitted to police that he was the person who shot Alothmani. The defendant's confession was corroborated by the testimony of Lampkins, who said that the defendant, Fletcher, and a third man proceeded to the store the night of the shooting, as well as that of Ahmed, who said that two black men entered the store at the time of the offense. Ahmed testified that the men wore white masks covering their faces, which corroborated the defendant's statement that he covered his face with a white t-shirt at the time of the incident. The defendant's statements were further corroborated by Jones, who said that three men ran past him shortly after he left the store the night of the shooting; Jones said that the men were "maybe in their teens," one of them appeared to have a "scarf or bandana or something" around his neck, and one of the men carried a handgun at his side. Thus, we conclude that the evidence was sufficient to establish that the defendant was the person who shot Alothmani. The evidence also established that the defendant, after devising the plan to rob a store, entered the Linc Minimarket and fired two shots, one of which struck Alothmani, killing him. As such, we affirm the defendant's convictions for first degree felony murder and attempted especially aggravated robbery.

In reviewing whether the evidence was sufficient to sustain the defendant's conviction for aggravated assault against victim Ahmed, we note that Ahmed did not testify that the defendant's actions placed him in fear. However, this court has concluded that the element of fear of imminent bodily injury may be inferred from the surrounding circumstances. See State v. Dotson, 254 S.W.3d 378, 395-96 (Tenn. 2008). In this case, Ahmed testified that when the defendant placed the gun in his face and demanded that Ahmed return inside the store, Ahmed placed his hands in the air, turned around, reentered the store, and told the defendant and the other assailant that he would give them the store's money. This evidence was sufficient to establish that Ahmed was placed in fear, and given the defendant's use of a gun to place Ahmed in fear, the evidence was sufficient to sustain the defendant's conviction for aggravated assault.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____D. KELLY THOMAS, JR., JUDGE